## NATIONAL LABOR RELATIONS BOARD v. WILLIAM DAVIES CO., Inc.

No. 8123.

Circuit Court of Appeals, Seventh Circuit.

April 21, 1943.

Rehearing Denied May 20, 1943.

Robert B. Watts and Max W. Johnstone, General Counsel, Ernest A. Gross, Associate General Counsel, Howard Lichtenstein, Asst. General Counsel, and Jacob I. Karro and Margaret M. Farmer, Attys., National Labor Relations Board, all of Washington, D. C., and Charles K. Hackler, of Warrensburg, Mo., for petitioner.

Lewis F. Jacobson, Sidney C. Nierman, and David Silbert, all of Chicago, Ill., for respondent.

Before EVANS and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge.

The National Labor Relations Board has petitioned for the enforcement of its order of December 15, 1941. The Board found that the respondent was guilty of unfair labor practices in violation of Sections 8(1) and 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1), (3). The Board ordered the respondent to cease and desist from discouraging membership in the United Packinghouse Workers of America, affiliated with the Congress of Industrial Organizations, hereinafter referred to as the union, or any other labor organization of its employees, by discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to the hire and tenure of employment, or any term or condition of employment of its employees; to cease and desist from in any manner interfering with, restraining or coercing its employees in the exercise of the right to self-organization; to take affirmative action by offering to James McNally, James Allen, Michael Moriarity, and John Canning immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority and other rights and privileges, and to make them whole by awarding to them back pay, less their net earnings; and to post the usual notices.

The questions presented on this appeal are whether the Board's order is sustained by substantial evidence, and whether the alleged laches of the Board shall be visited upon the employees found to have been discriminated against.

This company, as far as the record shows, had no background of anti-union activity. In the summer of 1939, the respondent's employees began to talk about a union. Michael Moriarity, who was among

the first to interest himself in and to join the union, joined December 13, 1939, and the agitation for the union continued with increased tempo thereafter. John Canning, an employee in one of the departments, was on December 16, 1939, while at work approached by the respondent's plant superintendent, who asked him how long he had been in the respondent's employ and whether he could obtain a job elsewhere if he were discharged, and stated to him that there were "men walking the streets today that are laid off on account of trying to organize the Union." Canning at that time was not a union member, but did thereafter join and was steward in his department. On the first day he wore his button at the plant, his foreman, McMahon, asked him "who I was stewarding it over," and on a subsequent pay day brought his pay check to him and said: "Here is your check, pin it on your button so you won't lose it because you seem to know all the answers." McMahon also said to employee Ahern, "I hear you are organizing a union again," and questioned another employee about the union strength.

While granting an increase in pay to a number of the employees, the respondent's plant manager said to one of these employees at the time the union was being organized in the plant and the increase in pay was put into effect: "You are getting more pay now than fellows across the street, although they have a contract there." The plant manager was referring to another packing concern across the street that had a contract with the union.

Moriarity was the leader of the union in the plant, and the secretary of the local. He had passed out cards and leaflets concerning the union and had held at least one meeting for organization purposes outside the plant, at which a union organizer was present and addressed the meeting. Moriarity received the distinction of being summoned before the plant superintendent, the plant manager, the vice president and the respondent's Canadian representative for a conference, at which conference union activities were discussed, although in a thoroughly friendly manner. It is a fair inference that Moriarity, who was just an ordinary laborer in the plant, would not have been so honored if the high officials of the respondent had not wished to convey to Moriarity their views about unionization, or to probe Moriarity about his.

On January 6, 1940, during the union's membership campaign, the respondent posted in its plant a notice prohibiting "The solicitation on company premises for membership in or for the purpose of collecting dues for any labor organization * * *" upon penalty of dismissal for violation thereof. The notice was directed only at those who solicited *on behalf* of the union, and applied whether such solicitation or other activities took place during working hours or upon the employees' own time. It is a fair inference from the posting of this notice and the scope thereof that it was intended to be antagonistic and discriminatory toward the union. Solicitation by others upon the company's premises at any time and a discussion of other subjects on the company's premises at any time were in no manner prohibited by the order.

We think these facts are sufficient to constitute substantial evidence that the respondent did interfere with, intimidate and coerce its employees in violation of Section 8(1) of the Act. While the circumstances are not numerous or particularly flagrant, yet they do indicate a purpose to interfere with the exclusive right of the employees to engage in organizational activities for the purpose of collective bargaining, as guaranteed by the Act. It seems to be necessary to emphasize again that the question of organization by the employees for the purpose of collective bargaining is the exclusive business and concern of the employees. It is the mandate of the statute that the employer shall not intrude himself into the picture. The slightest interference, intimidation or coercion by the employer of the employees in the rights guaranteed to the employees by the statute constitutes an unfair labor practice in violation of Section 8(1) of the Act. National Labor Relations Board v. W. A. Jones Foundry & Machine Co., 7 Cir., 123 F.2d 552; Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 126 F.2d 452; National Labor Relations Board v. Falk Corp., 7 Cir., 102 F.2d 383.

We come now to a consideration of the Board's finding of discrimination in violation of Section 8(3) of the Act. Four men were found to have been discriminated against: McNally, Allen, and Canning in their discharge, and Moriarity in the refusal to rehire.

McNally was employed continuously from May, 1938 to January 22, 1940, when he was

discharged for his alleged violation of the rule of the company to which we have referred, which forbade solicitation of membership or for collection of dues upon the company's premises. McNally joined the union on January 1, 1940 and started wearing his button. He participated actively in the organization, and was one of the union stewards. On January 8, 1940, the plant superintendent told McNally that he had received complaints that McNally had talked union to two different men during working hours. This McNally denied, and asked to be confronted with his accusers, but the superintendent declined to so confront him. McNally was told he was not supposed to talk unionism during working hours on the company's time, or at any other time upon the company's property. It was to McNally that the plant manager stated when he gave him a raise in pay that he was "getting more pay now than fellows across the street, although they have a contract there." The only incident charged to McNally as a violation of the non-solicitation rule of the company was based upon the circumstances of a conversation between McNally and a fellow workman, Stevens. McNally passed Stevens, who was a member of the union and who was not wearing his button. McNally asked him where his button was, and Stevens said it was in his pocket, whereupon McNally said, "Well, that is a hell of a place to have it." He did not solicit Stevens for membership. Stevens was already a member. Neither did he solicit him to pay his dues. It was only a passing remark of one workman to another, although about their union organization. This did not constitute a violation of the respondent's non-solicitation rule, as it prohibited only solicitation for membership and for payment of dues.

■ We think that the peremptory discharge of McNally, who was an active union man and known by the company's officials to be such, for the violation of a company rule within the scope of which his conduct did not come, together with the other facts and circumstances in the case, warrants the inference which the Board drew that McNally was discharged because of his union activities.

■ John Canning was employed by the respondent from October, 1938 until January 29, 1940, when he was discharged. The respondent contends that it discharged Canning because he failed to perform his work properly and because he joked around while on the job. It will be remembered that Canning is the employee whom the plant superintendent warned that he, the superintendent, knew of employees that were laid off on account of trying to organize the union, and that Canning is the employee to whom foreman McMahon had made derogatory remarks about his being a steward of the union. It was the plant superintendent who discharged Canning, and there seems to be no question but that Canning had not properly performed his work. The Board had to decide whether or not at the time the superintendent, who had made threatening remarks to Canning about union organization, discharged Canning, he did so because of Canning's union activities, or because of his failure to perform his work properly. The Board has decided this question against the respondent. We cannot say that there is not substantial evidence upon which the Board might base its conclusion that Canning was discharged because of his union activities.

■ The evidence supporting these two cases is so thin as to approach the last limit between evidence and no evidence. A fair-minded person might well conclude that the Board was prejudiced in its action, as counsel for the respondent seems to think. We have no power to review the Board's decision because it may seem to be prejudiced. We do think that the Board's decision in this case has reached the limit to which a court might go to sustain it.

■ With reference to employees Allen and Moriarity, we are unable to find any substantial evidence to support the Board's finding of discrimination in their cases. Allen had been employed by the respondent for about two years. He was discharged January 22, 1940. He was a night janitor. He belonged to the union and wore his button around the plant, and he was known to the officials of the plant as a member of the union. He solicited on the company's premises during working hours at least one employee to join the union, and while he was himself on duty, he solicited at least two other employees, who were not at the time on duty, but who were on the company's premises, as he was. This was clearly in violation of the company's rule against solicitation upon the company's premises during working hours. The rule posted by the company forbidding solicitation for union membership on the company's premises during working hours was

valid. The fact that the order the company posted was of a broader scope did not prevent the application of the rule to a valid situation to which it was clearly applicable.

■ We therefore have Allen discharged, as the respondent contends, because of his violation of the non-solicitation rule, and the clear and undisputed evidence in the record is that Allen had violated the rule.

In Allen's situation, there is nothing except his membership in the union from which the Board might reasonably draw the inference that his discharge was because he was a member of the union. We do not think that that is sufficient evidence to support the Board's inference that Allen was discharged because he was a union man, simply upon proof that he did belong to the union. If that were true, the discharge of every union man would support the inference that it was because he was a union man. The evidence as to the reason assigned by the respondent for the discharge of Allen is undisputed and wholly credible, and may not be entirely negated by the unreasonable inference drawn by the Board. We find there is no substantial evidence of discrimination in the discharge of Allen.

As we said before, Michael Moriarity was the secretary of the union, and its active leader around the respondent's plant. He had enjoyed the distinction of being called to the company's office for a conference with the high officials at which union activities were discussed, although he was just an ordinary laborer in the plant. He was not an exceptionally valuable or efficient laborer, according to his own testimony. He was employed to wash certain pans in which the meat products manufactured by the respondent were handled. It was a light job, and about the only job around the plant that Moriarity could do at that time, because he was ruptured. He had not been an efficient and careful workman, but by his negligent and careless conduct had failed to clean the pans properly, which pans it was his duty to clean and which by reason of their dirty condition might have subjected the company to a condemnation by the Federal Government inspector of the meat products placed upon the said pans. The undisputed evidence shows that Moriarity was not a particularly valuable or dependable employee.

■ Moriarity was discharged on January 24, 1940, because business was slack at that time. The Board finds that Moriarity's layoff on January 24 was not discriminatory. At the time he was laid off, the respondent's plant superintendent told him that he would be called back later. Moriarity thereafter sought reemployment. The respondent did not reemploy him, but employed someone else to do the work he had theretofore done. The Board found that the respondent refused to rehire Moriarity because of his union activities. The Board had found that Moriarity was not discharged discriminatorily on January 24, 1940. Whatever was in his background as a union man and whatever his union activities may have been prior to that time, did not affect the respondent's action in discharging him, so the Board found. If these circumstances, whatever they were, had no bearing upon Moriarity's discharge, by what stretch of the imagination can we say that they were controlling in the respondent's refusal to rehire? Up to the point of rehiring, the Board had exonerated the respondent from any discriminatory conduct with reference to Moriarity. What did the respondent do between the discharge of Moriarity and the time he had a right to expect a return to employment, to show that the respondent considered Moriarity's union activities, and for that reason refused to reemploy him? On this, the record is wholly silent. There is no evidence of discrimination, substantial or otherwise. The Board having found there was no discrimination in the discharge of Moriarity, we can find no substantial evidence of discrimination in the refusal to rehire him.

■ The respondent insists that the Board was guilty of laches in filing the complaint, and therefore back pay should begin only from the time the complaint was filed and not from the time the charges were filed. The respondent cites National Labor Relations Board v. Mall Tool Co., 7 Cir., 119 F.2d 700, in support of its contention. In that case it was the delay of the employees in filing their charges that was used against the employees to reduce the period of back pay. They were being visited with the penalty of their own laches. Here there is no complaint that the charges were not promptly filed. It is complained that the complaint was not promptly filed. If there were laches here, it was that of the Board and not of the employees. We

will not visit upon the employees the laches of the Board, if there were such laches. National Labor Relations Board v. Electric Vacuum Cleaner Co., 315 U.S. 685, 698, 62 S.Ct. 846, 852, 86 L.Ed 1120.

Except as herein indicated, the Board's order will be enforced, and the Board may submit an order therefor.