UNITED STEELWORKERS OF AMER-
ICA, CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Nutone, Incorporated, Intervenor.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

NUTONE, Incorporated, Respondent,
United Steelworkers of America,
CIO, Intervenor.

Nos. 12754, 12812.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 10, 1956.

Decided Nov. 23, 1956.

Writ of Certiorari Granted April 1, 1957.
See 77 S.Ct. 682.

Mr. Arthur J. Goldberg, Washington, D. C., with whom Mr. David E. Feller, Washington, D. C., was on the brief, for petitioner in No. 12754 and intervenor in No. 12812.

Mr. Arnold Ordman, Attorney, National Labor Relations Board, of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of Court, with whom Mr. Marcel Mallet-Prevost, Associate General Counsel, National Labor Relations Board, was on the brief, for respondent in No. 12754 and petitioner in No. 12812. Miss Fannie M. Boyls, Washington, D. C., also entered an appearance for respondent in No. 12754 and petitioner in No. 12812.

Mr. Charles A. Atwood, Cincinnati, Ohio, for intervenor in No. 12754 and respondent in No. 12812. Mr. Thomas E. Shroyer, Washington, D. C., also entered an appearance for intervenor in No. 12754 and respondent in No. 12812.

Before PRETTYMAN, WILBUR K. MILLER, and BASTIAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

These two cases come here from the National Labor Relations Board. The United Steelworkers of America began in the spring of 1953 a campaign to organize the employees of Nutone, Incorporated, a manufacturing concern of Cincinnati, Ohio. The campaign was heated but not violent. The ensuing election was lost by the Steelworkers, and shortly thereafter an unaffiliated union was formed in the plant. The Steelworkers filed with the Labor Board charges against Nutone, a complaint was issued, hearing was held, and a trial examiner's report and recommended order were issued. Exceptions were filed, and the Board adopted the examiner's conclusions in part and rejected them on one issue. The Steelworkers petitioned this court for review (No. 12754), and the Board petitioned for an enforcement order (No. 12812).

Upon the prehearing conference held in this court the issues in the two cases were phrased by stipulation made by the parties. We turn first to the Steelworkers case. The two issues there concern the denial of reinstatement and back pay to an employee named Virgie Marshall and the enforcement by the employer of a no-distribution rule against the union while it (the employer) distributed anti-union literature.

While the organization campaign was in progress a temporary layoff due to economic conditions occurred. Virgie Marshall was among the employees laid off. She was a pro-union advocate and, according to the record, possessed an unusual talent for vivid oral expression. She directed this talent at fellow workers outside the plant. The examiner said the witnesses attributed to her "vile and obscene statements, as well as cursing and profanity." References to the record indicate that his description was pallid. He recommended against requiring her reinstatement. Recognizing that "in the realities of industrial life, particularly where vital issues are at stake during a strike or an organizing campaign, employees frequently express their sentiments in crude and vulgar language, not suited either to the pleasantries of the drawing room or to the courtesies of parliamentary disputation", the examiner was nevertheless of opinion there are limits to permissible verbal assault. He thought there are bounds of language beyond which an employee may not go and still retain his

or her right to reinstatement. The Board agreed with the examiner. We have no difficulty in agreeing with the examiner and the Board on the point.[1] Perhaps such boundaries are far-flung, but wherever the line is drawn it will fail to encompass as permissible the language used by Virgie Marshall. The Board's power is to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of the Act.[2] The basic policy of the Act is industrial peace. The Board is justified in believing that there is language which, when applied directly and personally to fellow workers, is disruptive of that peace and tends to preclude settlement of disputes.

The second issue is a close and difficult one. The company, prior to and during the organization campaign, had and enforced rules forbidding employees to engage in solicitation of any kind on company time or to distribute on company property any literature or to post thereon any signs. The company itself, however, regularly posted signs and distributed literature on its property. During the campaign the company enforced uniformly the no-solicitation and no-distribution rules against both groups of contending employees, but it did not deem itself bound by these rules and distributed on its property eight pieces of anti-union but non-coercive literature.

The issue before us, as stipulated by the parties, is: Whether an employer commits an unfair labor practice if, during a pre-election period, it enforces an otherwise valid rule against employee distribution of union literature in the plant, while, during that same period, itself distributing non-coercive anti-union literature within the plant in a context of other unfair labor practices, committed prior to the election period and thereafter.

█ This stipulation of the issue is, we may safely assume, precisely drawn. The issue is not the naked question whether the employer commits an unfair labor practice by distributing his own literature. Neither is it the naked question whether the employer commits an unfair labor practice when he enforces a no-distribution rule against his employees. The issue is whether it is an unfair labor practice for the employer to do both things at the same time, i. e., simultaneously distribute his own literature and prohibit his employees from distributing theirs. Thus the problem is not the application of any single provision of the statute but involves the interplay of several rights, some statutory and some inherent. Section 7 of the Act[3] gives employees the right to organize. Section 8(a) (1)[4] protects that right by making it an unfair labor practice for an employer to interfere with his employees in their exercise of the right. Section 8(c)[5] provides that the dissemination of views in writing shall not constitute an unfair labor practice, if such expression contains no threat of reprisal or force or promise of benefit. Both employer and employees have rights of free speech. The employer has certain other inherent rights, such as the rights to production, to orderly conduct, and to cleanliness and order on his property. Sometimes these several rights conflict.[6] We have such a problem here.

1. See National Labor Rel. Bd. v. Longview Furniture Co., 206 F.2d 274 (4 Cir., 1953).

2. 61 Stat. 147 (1947), 29 U.S.C.A. § 160 (c).

3. 49 Stat. 452 (1935), as amended, 29 U.S.C.A. § 157.

4. 49 Stat. 452 (1935), as amended, 29 U.S.C.A. § 158(a) (1).

5. 61 Stat. 142 (1947), 29 U.S.C.A. § 158 (c).

6. E. g., Republic Aviation Corp. v. National Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 76 S. Ct. 679, 100 L.Ed. 975 (1956).

We first explore the situation presented by general considerations, absent subsection (c) of Section 8 of the Act. Except for the effect of legislation, and particularly Sections 7 and 8 (a) (1) of this Act, an employer's power to make rules governing employee organizational activities on company premises would be largely unlimited. Absent legislation he could promulgate and enforce rules prohibiting employees from soliciting in favor of a union or distributing union literature on the premises, solely because he was opposed to employee organization. The perquisites of possession or ownership shielded any anti-union purpose behind the employer's rules, just as liberty of contract shielded anti-union conditions on employment or discharge for union affiliations and activity. Under the statute, however, employees have a right to organize and to engage in activities in aid of organization. That is a broad and strong right, although it is not without limits. It does not take precedence over the right of an employer to conduct his business in a reasonable manner and with reasonable prospects of success. But the property rights of an employer do not, as a general principle, justify restrictions on self-organization not reasonably related to the conduct of the enterprise in which he is engaged. Just as discharge of a union adherent is justified if there is "cause" for the employer's action,[7] so too there must be "cause" for limitation of employee organizational activities.[8] The Supreme Court recently made this clear, saying, with respect to the rights of employees on company premises, "No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline." [9]

It is well established that no-solicitation rules are valid as to working time because of the obvious interest in maintaining productive activity, and that they are valid as to non-working time in certain establishments such as department stores because of the peculiar circumstances of the business.[10] But, where such circumstances do not exist and rules restricting solicitation are applied to non-working time, they are generally invalid as to employee activities.[11]

No-distribution rules have had a checkered history. At one time the Board held that in the interests of keeping the plant clean and orderly it was not unreasonable for an employer to prohibit the distribution of literature on

---

7. See 61 Stat. 147 (1947), 29 U.S.C.A. § 160(c).

8. Even where there is some valid purpose relating to production or discipline, the limitation may have so great an effect on employee rights that some disruption of the employer's usual freedom of action may be deemed necessary. See, e. g., Bonwit Teller, Inc., v. National Labor Relations Bd., 197 F.2d 640 (2 Cir., 1952), certiorari denied 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342 (1953).

9. National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 113, 76 S.Ct. 679, 100 L.Ed. 975 (1956). See also National Labor Relations Board v. Seamprufe, Inc., 222 F.2d 858 (10 Cir.1955), affirmed 351 U.S. 105, 76 S. Ct. 679, 100 L.Ed. 975 (1956); Maryland Drydock Co. v. National Labor Rel. Bd., 183 F.2d 538 (4 Cir., 1950); National Labor Relations Bd. v. American Furnace Co., 158 F.2d 376 (7 Cir., 1946); National Labor Relations Bd. v. American Pearl Button Co., 149 F.2d 258 (8 Cir., 1945).

10. National Labor Rel. Bd. v. May Department Stores Co., 154 F.2d 533 (8 Cir., 1946), certiorari denied 329 U.S. 725, 67 S.Ct. 72, 91 L.Ed. 627 (1946). See also Marshall Field & Co. v. National Labor Relations Bd., 200 F.2d 375 (7 Cir., 1952).

11. See Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); National Labor Relations Board v. Clark Bros. Co., 163 F.2d 373 (2 Cir., 1947); National Labor Rel. Board v. Glenn L. Martin-Nebraska Co., 141 F.2d 371 (8 Cir., 1944).

plant premises at all times.[12] Later the Board took the position that, absent a particular showing that the rule was necessary to plant discipline, an employer could not validly apply such a rule to employees on non-working time.[13] Finally, in Monolith Portland Cement Company,[14] the Board held that a no-distribution rule relating to the plant proper could be applied generally to non-working time, absent special circumstances, discrimination, or a specific purpose to suppress self-organization.

█ Our attention has not been called to any case under the Wagner Act or its successor in which it has been held that an employer can prohibit either solicitation or distribution of literature by employees[15] simply because the premises are company property.[16] Employees are lawfully within the plant, and non-working time is their own time. If Section 7 activities are to be prohibited, something more than mere ownership and control must be shown.

█ In the instant case no question is raised concerning the rule barring solicitation on company property. Nor is there any dispute concerning the general validity of a broad no-distribution rule like the one in effect at Nutone. However the justification for a broad no-distribution rule by an employer is the need for keeping the plant clean and orderly or the need to maintain discipline. And so Steelworkers argue that, if the company itself undertakes to distribute literature at approximately the same time that it prohibits employees from doing the same thing, the reason for the no-distribution rule is vitiated. They say that, if a rule must have a

reason in fact to support it, a rule demonstrably without a reason is invalid. The argument, premised upon Section 7 of the Act, and ignoring for the moment subsection 8(c), is supported by the authorities, as we have indicated. Employees have no right to use their employer's premises to urge a political cause, to support a charity, or to promote programs alien to the right of self-organization; but they do have a right to engage in Section 7 activities, and that right must be given effect unless there is some valid reason to the contrary relating to production or discipline.

Thus we come to the next phase of the problem. Does the fact that the employer distributes literature on the plant property demonstrate that there is no valid reason (in cleanliness, order, production, discipline, etc.) for prohibiting distribution? If the employer himself distributes literature in the plant, how can he validly assert that the distribution of literature would litter the property, distract attention from production, or instigate argument to the disruption of discipline? When the employer strips himself of the reason for his objection, does he not thereby lose the right to object?

In respect to distribution no one seems to dispute the right of an employer to impose upon his employees any and all restrictions, limitations, conditions, etc., which he imposes upon himself. These may relate to amounts, times, places, nature, and all the terms which may be imposed to protect order, cleanliness, production and discipline. The question is whether the employer, by distributing under certain conditions or restrictions,

---

12. Tabin-Picker & Co., 50 N.L.R.B. 928 (1943).

13. American Book-Stratford Press, Inc., 80 N.L.R.B. 914 (1948).

14. 94 N.L.R.B. 1358 (1951).

15. Cf. National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956).

16. In Midland Steel Products Co. v. National Labor R. Bd., 113 F.2d 800 (6 Cir., 1940), the court held that an employer could prohibit solicitation on company property at all times because of controversies and animosities likely to be aroused among employees.

thereby negatives the reason for prohibiting distribution under precisely those same conditions and restrictions.

This part of the problem is a matter of realism and common sense. It seems to us unrealistic to say that, if an employer distributes certain amounts of literature at certain places at certain times, he can nevertheless claim that the distribution of the same quantity of literature at the same places and at the same or similar times would be disruptive of order or cleanliness. This is one of the keys to the ultimate conclusion in the problem before us, but it is not susceptible of extended explanation or discussion. We think that, if an employer distributes literature in certain amounts under certain conditions, he cannot be heard to say that such distribution is a detriment to his operation; i. e., such a detriment as will support a restriction upon Section 7 rights of employees. It follows from National Labor Relations Board v. Babcock & Wilcox Co.[17] and cases there cited that, being without a reason for a rule, he is not entitled to a rule of no-distribution.

But it is argued that to hold that an employer may not prohibit employee distribution if he himself distributes is to impose a condition upon the employer's right to distribute. It is said that the holding would be equivalent to holding that an employer cannot distribute unless he permits employee distribution under similar conditions. And that argument brings us face to face with subsection (c) of Section 8 of the Act. Section 8 relates to unfair labor practices, and subsection (c) is:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

Interpretation of this subsection has given rise to many difficulties,[18] but we need not venture too far into the discussions in those cases. One view is that the subsection is absolute, the argument being that Congress was aware of the problem when it inserted this subsection in the statute in 1947. The Republic Aviation case [19] had been decided in 1945, and the Supreme Court had described the case (and its companion case, National Labor Relations Board v. Le Tourneau Company of Georgia) in the following language: "These cases bring here for review the action of the National Labor Relations Board in working out an adjustment between the undisputed right of self-organization assured to employees under the Wagner Act and the equally undisputed right of employers to maintain discipline in their establishments."[20] The Senate Report on the proposed subsection [21] specifically referred to the restriction placed by the Board upon the decision in Thomas v. Collins [22] and said that it believed the Board's decision in Clark Bros. Co., Inc.,[23] to be too restrictive. If Congress,

17. Supra note 15.

18. Bonwit Teller, Inc., 96 N.L.R.B. 608 (1951), enforcement denied 197 F.2d 640 (2 Cir., 1952), certiorari denied 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342 (1953); Livingston Shirt Corporation, 107 N.L.R.B. 400 (1953); National Labor Relations Bd. v. F. W. Woolworth Co., 214 F.2d 78 (6 Cir., 1954). And see Note, Limitations upon an Employer's Right of Noncoercive Free Speech, 38 Va.L.Rev. 1037 (1952); Note, The Coercive Character of Employer Speech: Context and Setting, 43 Geo.L.J. 405 (1955).

19. Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

20. 324 U.S. at pages 797–798, 65 S.Ct. at page 985.

21. S.Rep. No. 105, 80th Cong., 1st Sess. 23–24 (1947).

22. 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

23. 70 N.L.R.B. 802 (1946), enforcement granted 163 F.2d 373 (2 Cir., 1947).

with the general problem thus before it, had intended that the dissemination of views be subject to other limitations, it would have said so. The subsection says flatly that the dissemination of views in written form shall not constitute an unfair labor practice if the expression contains no threat of reprisal or promise of benefit. It contains no other condition or limitation. To say the subsection means that such distribution shall not constitute an unfair labor practice when, as, and if it is coupled with permission to employees to distribute would be to write into the statute a condition not there. The foregoing is the course of one side of the debate.

The other view is that the subsection undoubtedly wipes out the taint of discrimination which might attach to a speech by an employer favoring one union as against another, or against any and all unions, and which might thus be illegal as unfair.[24] It wipes out the obligation of an employer to afford affirmatively to his employees equal opportunity with himself to distribute or to solicit. But it does not wipe out the basic rule that in order to enforce a no-distribution rule against employees the employer must have a valid reason.

The former of the foregoing views is the one taken by the Court of Appeals for the Sixth Circuit in the Woolworth case [25] and by Judge Swan dissenting in Bonwit Teller.[26] With the utmost deference to those authorities we find ourselves in disagreement with them. We think the latter of the two views above described is correct.

We suppose everyone would agree that the question is a close and elusive one. Indeed the answer might almost seem to depend upon the way in which the question is put. If we ask, "May an employer distribute noncoercive literature on plant property if he does not also permit employees to do the same thing?", the answer might seem to be, under subsection (c), "Yes." But that is not the question here. The question is: May an employer prohibit employees from distributing literature on plant property if he has by his own action demonstrated the absence of a valid reason for such a prohibition? And the answer to that question must be: He may not.

We think the conclusion we reach does not write an improper restriction upon a statutory provision not so restricted in terms. Section 8 of the Act flatly prohibits an employer from interfering with the organizational activities of his employees. But the Board and the courts have held that he may interfere with those activities for reasons which he finds in the needs of production, order, cleanliness or discipline. That permission to him is not in the statute in terms. It was a recognition by the enforcing authorities of inherent rights on the part of the employer. It takes no amendment to the statute to say that, when this permission, engrafted upon the statute, is not applicable to a given employer, the unrestricted prohibition of the statute against interference with employee activities comes into play. The statute itself is not thereby amended; it thereby comes into literal effect.

We are fully aware of the restrictions upon judicial review of Board findings and orders, but the present case concerns statutory interpretation and clearly falls within the competence of the court to rule upon the questions presented.

We conclude that the employer here, Nutone, Incorporated, was guilty of an unfair labor practice when it prohibited its employees from distributing organizational literature on company property during non-working hours.

24. See, e. g., National Labor Relations Bd. v. American Furnace Co., 158 F.2d 376 (7 Cir., 1946).

25. National Labor Relations Bd. v. F. W. Woolworth Co., 214 F.2d 78 (6 Cir., 1954).

26. Supra note 8, 197 F.2d at page 646.

The Board's conclusion to the contrary must be set aside and the case remanded with directions to modify paragraph (c) of the order so as to require Nutone to cease and desist from enforcing its no-solicitation and no-distribution rules in a manner inconsistent with this opinion.

This brings us to the case brought here by the Board for enforcement of its order and Nutone's answer to the Board's petition. The questions, as stipulated, concern the sufficiency of the evidence to support three findings by the Board: (1) that Nutone violated Section 8(a) (1) by certain actions toward employees in respect to union activities; (2) that Nutone's failure to recall certain employees after an economic layoff was because of union activity; and (3) that a certain employee (Puckett) did not so conduct herself as to render her unsuitable for reinstatement. We have examined the evidence from which the Board derived these findings and think it is substantial. The portions of the Board's order based upon these findings will be affirmed.

Upon the foregoing bases the order of the Board must be modified as indicated in this opinion and, as so modified, will be enforced.